UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SHERRY KRAUS,           )
                                         )
          Plaintiff,        )
                                         )
v.                           )        No. 4:15 CV 718 JMB
                                       )
ASCENSION HEALTH LONG TERM  )
DISABILITY PLAN, and       )
                                         )
SEDGWICK CLAIMS MANAGEMENT  )
SERVICES, INC.,        )
                                         )
          Defendants.    )

## MEMORANDUM AND ORDER[1]

     Sherry Kraus ("Kraus") filed this lawsuit under Section 502 of the Employee Retirement

Income Security Act of 1974 ("ERISA").  (ECF No. 1)  Kraus alleges that Ascension Health

Long Term Disability Plan and Sedgwick Claims Management Services, Inc. (individually,

"Ascension" or "Sedgwick;" collectively, "Defendants") improperly terminated her Long Term

Disability ("LTD") benefits, in violation of ERISA.  Kraus seeks, *inter alia*, declaratory relief,

reinstatement of her benefits with interest, and attorney's fees.  (Id. at 7)  In their Answer,

Defendants deny that Kraus is entitled to LTD benefits or that they violated ERISA in any

respect.  (ECF No. 8)

     Currently before the Court are cross-motions for summary judgment filed by Defendants

and Kraus.  (ECF Nos. 46, 49)  Both parties have submitted statements of uncontested material

facts.  Both parties have filed responses in opposition to the other parties' motions for summary

judgment, and filed replies in support of their own motions for summary judgment.  The motions

---

[1] Both parties have consented to the jurisdiction of the undersigned United States
Magistrate Judge pursuant to 28 U.S.C. § 636(c).

are now fully briefed.  On June 8, 2016, the Court heard oral argument from the parties concerning their respective motions.  The matter is now ripe for disposition.  Based on the undisputed facts in the record, and the applicable law, Defendants are entitled to summary judgment.  Therefore, the Court will grant Defendants' Motion for Summary Judgment, and deny Plaintiff's Motion for Summary Judgment.[2]

I.    **Background**[3]

A.    **Factual Background and Medical Evidence**

In March of 2010, Kraus was working as an ultrasound technician for St. John's Providence Hospital in Warren, Michigan.  (AR[4] 106)  Among other duties, Kraus was responsible for performing ultrasound scans prescribed by physicians, and monitoring patients during the exam.  On March 25, 2010, however, Kraus suffered a wrist injury during a car accident, which left her unable to work.  Kraus suffered from symptoms such as limited range of motion in her wrist, pain, wrist and hand weakness, stiffness, tingling, and headaches.  Kraus was unable to work from March 26, 2010.  (AR 1196)

At the time of her accident, Kraus was covered by a Long Term Disability ("LTD") plan which provided—after a six month waiting period—disability benefits equal to 70 percent of her pre-injury salary if she could no longer discharge the "material duties" of her job.  Kraus applied for disability benefits, and was approved.  (AR 114-15)  In approving her LTD application, the

---

[2] The Court has subject-matter jurisdiction under 29 U.S.C. §§ 1132(e), and (f).

[3] In its discussion of the factual background, the Court will either refer to uncontested facts, or construe any facts that are in genuine dispute in favor of Kraus.  See Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).

[4] "AR" is a reference to the Administrative Record filed by Defendants in this matter.

administrator of the benefits plan determined that Kraus could not perform her job as an ultrasound technician.

In the months after her accident, Kraus underwent extensive medical treatment and physical therapy. Her treatment team included Dr. James Dietz, M.D., ("Dr. Dietz") an orthopedic surgeon, who treated her wrist injury; Dr. Christina Winder, M.D., ("Dr. Winder") Kraus' internal medicine doctor; and St. John's Northshore Rehab, which provided physical therapy. (AR 110)

In June of 2010, Dr. Winder referred Kraus to Dr. Dietz for treatment of her wrist injury. (AR 130) On June 29, 2010, Dr. Dietz and Kraus decided to proceed with surgery to repair a tear on the TFCC[5] in her wrist. (Id.) Dr. Dietz performed the surgery in July of 2010. Follow-up visits on August 10, 2010, September 9, 2010, and October 12, 2010 all revealed that Kraus was recovering nicely. (AR 131-33) The incision was "nicely healed," with minimal swelling, but some soreness. (AR 131) On September 9, 2010, Dr. Dietz determined that Kraus would continue to be disabled from work until her next appointment with him on October 12, 2010. (AR 113) On December 13, 2010, Kraus also underwent surgery to release a tendon sheath and reduce inflammation in the wrist. (AR 128-29) In his progress notes, Dr. Dietz noted that Kraus had minimal swelling, good digital motion, and minimal stiffness in her wrist. Dr. Dietz opined that he hoped he could "get her back to work as an ultrasound tech" after her follow-up a month later. (AR 135)

Kraus entered physical therapy at St. John's North Shores Hospital in January and February of 2011, and again in July and August of 2011. (AR 141-45, 182-88) The purpose of

_____

[5] TFCC stands for triangular fibrocartilage complex. The TFCC is a cartilage structure located on the small finger side of the wrist that cushions and supports the small carpal bones in the wrist. The TFCC also keeps the forearm bones stable when the hand grasps or the forearm rotates.

the physical therapy was to increase functionality in her injured hand, and reduce pain levels.

(AR 148) At the beginning of her physical therapy, Kraus reported a pain level of 3 out of 10,

although she reported experiencing increasing pain with increasing effort and activity. (AR 141-

45) The physical therapist noted that Kraus was experiencing decreased hand strength and

"decreased performance with her hand." (AR 147) However, these notes did not provide any

opinion that Kraus was unable to work, or provide an evaluation of Kraus' work-related

restrictions. (Id.) By the end of the physical therapy sessions in the fall, the records show that

Kraus had made "good progress," but some pain, discomfort, and functional limitations

remained. (AR 187)

In September 2011, after this physical therapy, Kraus underwent a Functional Capacity

Evaluation (the "2011 FCE") to evaluate her functioning. (AR 217-226) Mary Ellen Keyes

("Keyes"), the occupational therapist who conducted the 2011 FCE, found that Kraus was

functioning between a Sedentary and Light level of work.[6] (AR 219) This meant that Kraus was

capable of lifting and carrying 15-20 pounds occasionally. (Id.) Keyes thought Kraus would

benefit from 4-8 weeks of a Work Hardening Program.[7] (Id.)

After her Work Hardening Program, Keyes sent a progress report to Dr. Dietz dated

January 12, 2012. In her progress report, Keyes confirmed that Kraus was not yet capable of

performing her previous job as an ultrasound technician, but that Kraus was functioning at a

---

[6] A Sedentary level of work includes occasional lifting of 10 pounds or less. A Light level of work includes occasional lifting of 20 pounds or less and frequent lifting of 10 pounds or less.

[7] A Work Hardening Program, as discussed in this case, is a rehabilitation program designed to restore functional and work capacities to an injured worker through application of graded work simulation. Central to the work hardening programs in this case is the reproduction of a work-like environment where tasks are designed to improve the patient's tolerance for productive work. The goal of a work hardening program is to achieve the functional level of productivity to allow a patient's return to prior work or a new type of work.

Light level of work. (AR 238-40) At that point, Dr. Dietz permitted Kraus to return to work, but with restrictions: she could not lift over 20 pounds, nor engage in any repetitive grasping, pushing, or reaching with her right hand for six months. (AR 249) With these restrictions, she could not return to her previous job as an ultrasound technician.

During this time, Kraus continued to see Dr. Dietz, and underwent some additional surgeries to increase her wrist functionality. In April of 2011, Kraus required a right ulnar shortening osteotomy. Finally, in June of 2012, Dr. Dietz removed some hardware from Kraus' right hand. In following up with the disability insurer, Dr. Dietz opined that Kraus would be off of work until July 16, 2012. (AR 293) On August 22, 2012, Dr. Dietz updated his recommendations, keeping Kraus off of work until October 17, 2012. (AR 329)

In January of 2013, Dr. Dietz referred Kraus to another Work Hardening Program with occupational therapist Keyes, after noting that physical therapy had been "improving" her wrist functioning and that she had "fairly good range of motion" but remaining pain and wrist swelling.[8] (AR 310, 406-07) Two days before the Work Hardening Program began, Kraus participated in a second FCE (the "2013 FCE"). In this FCE, Keyes still found that Kraus was "functioning between a Sedentary and Light" level of work. Kraus was able to lift and carry 15-20 pounds occasionally. (AR 424)

Two days after the FCE, Kraus began the Work Hardening Program recommended by Dr. Dietz. She attended a total of 20 sessions with no absences. These sessions lasted for three hours a day, five days a week. (AR 426) As part of her Work Hardening Program, Kraus performed range of motion, strengthening, and endurance exercises. She also performed work

---

[8] Kraus was undergoing additional physical therapy in June and July of 2012. Kraus continued to have functional limitations in her wrist and some pain. (AR 304) The physical therapist recommended that Kraus use a brace for wrist support when lifting and that Kraus attend an additional work hardening program. (AR 305)

simulation exercises. The Discharge Summary notes indicate that Kraus "made progress overall" but had reached a plateau as increases in work simulation activities were added to the program. Pain and limitations in the right forearm and wrist meant that Kraus was not, at that point, "equal to the physical demands of the job of an Ultrasound Technician." (AR 427) The summary concluded that Kraus was functioning at a Sedentary level of work, but that she should "avoid jobs that require prolonged and repetitive grasping, pushing, and reaching with the right dominant hand and arm."[9] (Id.)

In the meantime, Kraus apparently began developing spinal issues. For example, on December 2, 2013, Dr. Kanweldeep Sidhu, M.D., ("Dr. Sidhu") performed an anterior cervical discectomy with fusion[10] on Kraus, in order to deal with her complaints of paresthesia, numbness and tingling in her right arm, which she had experienced for four to five months, at that time. Dr. Sidhu opined that Plaintiff would be off work for approximately six weeks after the surgery. (AR 998-1000)

One final point is relevant to Plaintiff's medical issues. As noted above, from September of 2010, Kraus was receiving disability benefits under the terms of her LTD Plan. One of these terms was that Kraus was required to apply for Social Security Disability ("SSDI") benefits. Kraus did so on May 10, 2011. Although Kraus' initial application for benefits was denied, an administrative law judge found, in August of 2012, that Kraus was disabled under the Social Security Act, and that her disability dated from March of 2010. (AR 332-44)

---

[9] On May 9, 2013, Dr. William Barker, one of Plaintiff's treating physicians, opined that Kraus was disabled from her own occupation due to the TFCC tear, with no date to return to work listed. (AR 288) For his objective medical evidence in support of this conclusion, Dr. Barker indicated only, "[p]lease see Dr. Dietz' notes regarding this." (Id.)

[10] An anterior cervical discectomy with fusion is a surgery designed to relieve spinal cord or nerve root pressure in the neck by removing all or part of a damaged disc.

Specifically, the ALJ found that under the Social Security Act, Kraus had the Residual

Functional Capacity to engage in sedentary work; but the ALJ also found, based on hearing

testimony that the ALJ found credible, that Kraus could only use her dominant right hand for 15

minutes at a time, and could lift no more than 2-5 pounds with her right hand.  (AR 337)  Given

those additional exertional limitations, the ALJ found that there were no jobs that Kraus could do

in the national economy.  (AR 344)  Kraus was therefore entitled to substantial retroactive

benefits.  Kraus paid over $25,000 of these back benefits to Ascension, under the terms of the

LTD Plan.  (AR 371, 373-75)

**B.  Kraus' LTD Claim**

In August of 2010, after the required six month waiting period, Kraus applied for LTD

benefits under the Ascension Health Long-Term Disability Plan.  (AR 94)  The Plan at issue in

this case is sponsored by Ascension, for the benefit of eligible employees of St. John Providence

Health System, in Warren, Michigan.  (AR 6, 56-59)  The Plan pays monthly disability benefits

equal to 70 percent of an employee's pre-disability annual salary.  (AR 57)  The Plan is an

employee welfare benefit plan governed by ERISA.  (AR 7, 15)  Sedgwick is the claims

administrator for the Plan.  (AR 62, 68)  Under the Plan, Ascension pays the disability benefits

and Sedgwick is granted the discretionary authority to decide all claims and interpret the terms of

the Plan.  (AR 15-18)

In order to be entitled to benefits under the Plan, a claimant must meet the definition of

disability laid out in the Plan documents.  The Plan defines disability in relevant part as follows:

> **1.11 Disability or Disabled** means that due to an Injury or Sickness which
> is supported by objective medical evidence,
>
> > (a) the Participant requires and is receiving from a Licensed
> > Physician regular, ongoing medical care and is following the course of treatment
> > recommended by the Licensed Physician; and

...

(1) The participant is unable to perform:

(A) during the first 24 months of Benefit payments, or eligibility for benefit payments, each of the Material Duties of the Participant's Regular Occupation; and

(B) after the first 24 months of Benefit payments, or eligibility for Benefit payments, any work or service for which the Participant is reasonably qualified taking into consideration the participant's training, education, experience and past earnings.

(AR 8-9)

On September 23, 2010, Kraus was approved for LTD benefits under the "own occupation" [11] standard in subsection A, and Defendants began paying benefits. (AR 114-15) For the first two years of benefits (September of 2010 through September, 2012), Kraus was considered disabled if she was unable to perform each of the material duties of her regular occupation as an ultrasound technician. Throughout these two years, Defendants agreed that Kraus was unable to perform the material duties of her normal occupation.

After the first two years of benefits payments, however, (i.e., September, 2012), the Plan provided that Kraus was entitled to continue receiving LTD benefits only if she was unable to perform any work or service for which she was reasonably qualified, taking consideration her training, education, experience, and past earnings. In other words, Kraus had to meet the "any occupation" standard after the first two years of disability benefits.

On March 22, 2012, Sedgwick provided Kraus with an update concerning her current disability status, and giving notice to her that by September of 2012, her benefits under the "own

_____

[11] Throughout this opinion, the Court will refer to the standard of disability described under subsection "A" as the "own occupation" standard; the standard under subsection B is the "any occupation" standard. These are the terms that the parties use for the two definitions of disability that are relevant to this decision.

occupation" standard would be exhausted.  (AR 250-51)  That update further informed Kraus that beginning on September 22, 2012, she would have to be disabled under the "any occupation" standard defined in the Plan.  (AR 251)  The letter concluded by informing Kraus that Sedgwick was beginning the process of gathering information so as to make a decision by September of whether Kraus was entitled to continue receiving benefits.  (Id.)

In gathering information for making the disability determination under the "any occupation" standard, Defendants asked Kraus to fill out a Daily Activities Review.  Kraus completed a daily activities questionnaire in April of 2012.  (AR 265-69)  Kraus confirmed that she was able to tend to self-care activities; prepare meals; do household chores for limited durations; shop; complete aerobic, strength training, and wrist/hand exercises; drive; and use a computer.[12]  (Id.)  Kraus also gave Defendants a list of her treating physicians, to whom Sedgwick subsequently sent disability evaluation forms.  (AR 269-70)

On September 6, 2012, Defendants notified Plaintiff that her first twenty four months of disability had ended and the "any occupation" standard was applicable.  For the time being, however, Defendants concluded that Plaintiff was disabled from "any occupation" and her LTD benefits continued.  (AR 347)

In June of 2013, while making LTD payments under the "any occupation" standard, and as part of its process for determining whether Kraus was disabled under the "any occupation" standard, Sedgwick referred Kraus' claim file to a third party consultant called Genex Services to

---

[12] Kraus also filled out a "Training, Education and Experience Statement," in which she informed Defendants of her educational and occupational background.  Kraus discussed details such as her college degrees and coursework, and the specific tasks that her previous occupations had required.  (AR 261-62)

complete a Transferable Skills Analysis ("TSA").[13]  The TSA conducted by Genex, dated July

11, 2013, identified several jobs that Kraus could perform, given her experience, education, and

physical limitations.  These jobs included Ophthalmic Technician; Stress Test Technician;

Cardiac Monitor Technician; Information Clerk/Receptionist; Counter Clerk; Membership

Solicitor; and Telephone Solicitor.  (AR 445)  Shortly after receiving this TSA, Defendants

informed Kraus that she was no longer considered disabled under the "any occupation"

definition, because her training, education, and experience, combined with her functional

abilities, meant that she was capable of performing the jobs listed in the TSA.  (AR 448-50)

  In addition to the TSA, the letter indicated that Sedgwick's decision was based upon the

FCE[14], which indicated that Kraus had the ability to engage in Sedentary work.  The letter also

indicated that a nurse named Margie Varo, RN, CCM, CDMS, reviewed the file as part of the

decision.  (AR 449)  Because Kraus could engage in Sedentary work, and because the relevant

definition of disability at that time required that a claimant not be able to do any occupation,

Kraus was no longer entitled to disability benefits under the Plan.  (Id.)

  Kraus initiated an internal appeal of Sedgwick's determination that she was not disabled.

(AR 455-59)  In considering this appeal, Sedgwick referred Kraus' file to another third party

contractor—Reliable Review Services—which gave Kraus' medical records to an independent

physician, Dr. Victor Parisien, M.D., ("Dr. Parisien") for review.  (AR 984-95)  Dr. Parisien's

job was to evaluate the accuracy of the initial denial from a medical point of view.  As part of his

---

[13] A Transferable Skills Analysis is a set of tests to determine what positions a person may fill if their previous position no longer exists in the local job market, or they can no longer perform their last position (e.g., because of an injury).

[14] The initial notification did not specify whether it was based on the 2011 FCE or the 2013 FCE.  Plaintiff argues that this is a material omission.  The Court will discuss this question below.

review, Dr. Parisien reviewed numerous medical documents contained in the claim file. (AR 992-95) Dr. Parisien also attempted to speak with Kraus' medical providers, including Dr. Dietz, Dr. William Barker, D.O. ("Dr. Barker"), and the physical therapist, Ms. Keyes. (AR 989) Dr. Parisien was only able to make contact with Dr. Sidhu, one of Plaintiff's spine specialists. (Id.)

On December 10, 2013, Dr. Parisien issued findings based on his review of Kraus' medical records and the conversation with Dr. Sidhu regarding Kraus's cervical spine condition. (AR 996-1005)[15] Dr. Parisien confirmed that, although Kraus had had a number of surgical procedures on her wrist, her recent 2013 FCE and other medical records showed her to be functioning at least at a Light work level. (AR 1001) Further, Dr. Parisien found that there was no medical evidence to suggest that she was unable to work as of August 1, 2013. (AR 1002)

At that point, Defendants referred Kraus' file back to Genex to conduct a second TSA after she had recovered from her December, 2013 back surgery. (AR 1007-12) This TSA was completed on March 14, 2014, and confirmed that Kraus was functioning between a Sedentary and Light level of work and that there were various occupations that were within her physical limitations, skills and abilities. Therefore, Defendants notified Kraus on April 22, 2014 that, based upon its review of the claims file and medical records, the independent review of Dr. Parisien, and the results of the FCE and the two TSA's, Kraus was not qualified for continuing LTD benefits under the Plan as of August 1, 2013 and denied her appeal. (AR 1013-15) At that point, Kraus had exhausted her procedural remedies under the terms of the LTD plan, and was entitled, under ERISA, to file a court challenge. (See AR 1015) ("This represents the Sedgwick

---

[15] Dr. Parisien's original report was dated December 10, 2013, but on January 16, 2014, Dr. Parisien clarified a point of ambiguity from his original report. Dr. Parisien clarified Kraus' specific exertional limitations, finding that she was capable of lifting 10 pounds frequently, and 20 pounds occasionally, and that she could lift to waist level and overhead. He further clarified that Kraus had "no limitation on walking, sitting, bending and crouching." (AR 1005)

National Appeals Unit final decision with respect to your LTD claim … You have a right to bring a civil action under Section 502(a) of [ERISA].")

### C.  Procedural History

Defendants made their determination final on April 22, 2014.  (AR 1013-15)  Kraus subsequently filed this lawsuit on May 6, 2015.  (ECF No. 1)

In her lawsuit, Kraus alleges that Defendants' decision denying continuing benefits was not supported by substantial evidence, and that it conflicted with several specific requirements under ERISA.  Defendants, on the other hand, respond that their decision complied in all respects with the procedural and substantive requirements of ERISA, and that substantial evidence supports the decision to deny Kraus continuing benefits.  As part of her argument, Kraus had initially sought more detailed discovery than is usually permitted in ERISA cases such as this (which is usually the administrative record).  Plaintiff asserted that this additional discovery was necessary to uncover facts that would demonstrate a conflict of interest in Defendants' decision-making process, thus entitling Plaintiff to a more stringent standard of review in federal court.

In its Case Management Order, the Court invited Plaintiff to file a motion in support of her contention that additional discovery in this matter was merited.  (ECF No. 16 at 1)  Plaintiff did not file any such motion in this case.  Therefore, discovery in the matter was not expanded beyond the administrative record.

On January 28, 2016, Defendants filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, a memorandum of law, and proposed findings of uncontested material facts.  (ECF Nos. 46-48)  On January 29, 2016, Kraus filed a motion for summary judgment, a memorandum of law in support, and her own proposed uncontested facts.  (ECF Nos 49-51)  Both parties filed responses in opposition to the other parties' motions for

summary judgment, as well as replies in support of their respective summary judgment motions. (ECF Nos. 56, 58, 62, 63)

After the briefing was complete, the Court ordered oral argument on the parties' motions. (ECF No. 64)  On June 8, 2016, the parties appeared for oral argument in support of their respective motions for summary judgment.  The matter is now fully briefed and argued, and it is ready for disposition.

## II.    <u>Discussion</u>

### A.  <u>Legal Standards</u>

#### 1.  <u>Summary Judgment Generally</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  <u>See</u> Fed. R. Civ. P. 56(a).  Under Rule 56, a party moving for summary judgment bears the burden of demonstrating that no genuine issue exists as to any material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Once the moving party discharges this burden, the non-moving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of *some* alleged factual dispute."  <u>Anderson</u>, 477 U.S. at 247 (emphasis in original).  The non-moving party may not rest upon mere allegations of denials of his pleadings. <u>Id</u>. at 256.  Furthermore, "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment.  <u>Id</u>. at 248.  A fact is material only when its resolution affects the outcome of the case.  <u>Id</u>.  The Court must construe all facts and evidence in the light most favorable to the

non-movant, and must refrain from making credibility determinations and weighing the evidence.  Id. at 255.

## 2. Judicial Review of ERISA Claims

In reviewing an ERISA complaint, this Court follows the principles laid out in Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008) (discussing the standard of review that federal district courts should employ in reviewing benefits eligibility decisions under ERISA).  If an ERISA plan expressly grants discretionary authority to the plan administrator to make benefits determinations and interpret plan terms, this Court reviews the administrator's benefits determination for an abuse of discretion.  Glenn, 554 U.S. at 111; see also Whitley v. Standard Ins. Co., 815 F.3d 1134, 1140 (8th Cir. 2016) (same).  Under the abuse of discretion standard, this Court must uphold a plan administrator's decision as long as it is based on a reasonable interpretation of the Plan and is supported by substantial evidence.  A decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision.  Ingram v. Terminal R.R. Ass'n of St. Louis Pension Plan for Nonschedule Emps., 812 F.3d 628, 634 (8th Cir. 2016).  In arriving at its decision, the Court reviews the "final claims decision," and the "complete record."  Whitley, 815 F.3d at 1140.

There are two main circumstances, however, in which a reviewing federal court will take a more stringent look at the administrator's decisions.  First, if the plan documents do not grant the administrator discretionary authority, this Court's review is *de novo*.  Glenn, 554 U.S. at 111.  Both parties agree, however, that this exception is not relevant here, because the Plan clearly gives Sedgwick discretionary authority.

Second, in situations where a plan is both the payor of benefits and the administrator who determines eligibility for benefits, the plan is operating under a conflict of interest. Glenn, 554 U.S.at 112. A reviewing Court must take that conflict of interest into account. Glenn, 554 U.S. at 115. In these situations, "the court still applies the deferential abuse-of-discretion standard, but the fiduciary's conflict of interest is one factor to be considered in the review." Hampton v. Reliance Standard Life Ins. Co., 769 F.3d 597, 601 (8th Cir. 2014) (internal citations omitted). The impact of this factor in a given case is to be decided on a case-by-case basis. For example, where there is a history of biased claims adjudications, the structural conflict "should prove more important (perhaps of great importance)." Glenn, 554 U.S. at 117. On the other hand, in situations where there is no additional evidence of an administrator's bias outside of the structural conflict, that factor "reduce[s] to the vanishing point." Whitley, 815 F.3d at 1140 (internal quotation mark and citation omitted). Plaintiff alleges that this exception to the abuse of discretion standard applies here, and the Court will discuss this argument in more detail, below.

**B. <u>Analysis</u>**

Kraus makes several arguments in support of her claim that termination of her benefits was an abuse of discretion, and not based on substantial evidence. Specifically, Kraus argues:

> (1) that the initial denial letter sent by Sedgwick in July of 2013 failed to adequately notify her of the reasons for terminating her benefits, and that Defendants impermissibly changed the reason;

> (2) that the initial termination of benefits was not based on substantial evidence where Kraus' condition did not change or improve, and yet Defendants relied on the same information to both approve and then later terminate Kraus' claim;

> (3) that the medical review conducted by Defendants was insufficient where it relied upon a hired physician reviewing a paper record while "ignoring" the opinions of Kraus' treating physicians;

(4) the termination decision did not consider the impact of all of Kraus' medical conditions;

(5) the termination decision did not consider the impact of Kraus' pain;

(6) Defendants did not properly take into account the Social Security Administration's finding that Kraus was disabled; and

(7) Defendants "selectively reviewed" the medical evidence, improperly overlooking "the bulk of the evidence supporting" Kraus' disability claim.

(ECF No. 50 at 4-14)

Overlaying all of these arguments is Kraus' contention that Defendants are operating under an inherent conflict of interest, because Kraus believes that the plan administrator "both administers and funds" the plan. (ECF No. 50 at 14) Kraus argues, therefore, that this Court should consider that conflict of interest as a factor in evaluating the entire case and apply a more stringent review of Defendants' actions. Because this allegation is relevant to all of the specific arguments that Kraus has enumerated, the Court will address that issue first, and then move on to discuss each of the arguments articulated by Kraus, above.

## 1. <u>Conflict of Interest/Standard of Review Determination</u>

In her motion for summary judgment, Kraus argues that Defendants operate under a structural conflict of interest, and therefore, the decision terminating Kraus' benefits should be evaluated more stringently than it would under a traditional abuse of discretion standard. (ECF No. 50 at 3-4)

In support of this contention, Kraus argues that "Defendant Ascension retains discretionary authority to determine eligibility for benefits, even though it hired Sedgwick to co-administer its claims. Ascension also holds the pocketbook." This, Kraus argues, "creates an inherent conflict of interest which this Court must consider when determining whether Defendants abused their discretion in terminating Plaintiff's benefits." (ECF No. 50 at 3) Kraus

implies that Ascension has a financial incentive to improperly deny benefits. In making this argument, Kraus cites generally to Metropolitan Life Ins. Co. v. Glenn, and argues that this Court should make a more searching inquiry of Defendants' decision.

In Glenn, Metropolitan Life Insurance Company ("MetLife") was an administrator of a disability insurance plan and held discretionary authority to determine eligibility for disability benefits for Sears' employees. MetLife also paid benefits out of its own pocket for all of the employees who were deemed eligible for disability benefits.[16] Glenn, 554 U.S. at 109. Wanda Glenn, an employee of Sears covered by the Plan, became disabled due to a heart disorder. Glenn was granted an initial twenty four months of benefits under the plan. After twenty four months, MetLife determined that she was capable of doing sedentary work, and denied her further benefits.

The Supreme Court held that MetLife's dual role of both evaluating benefits eligibility and paying for benefits claims created a conflict of interest because MetLife had a financial interest in denying claims where it was the one who pays the claims. Glenn, 554 at 112. The Supreme Court held that this conflict of interest was not itself dispositive, but it was one factor that a federal court must take into account in evaluating whether the decision denying benefits is supported by substantial evidence on the one hand, or arbitrary and capricious on the other hand. See id. at 116-17 (discussing how a structural conflict of interest is to be taken into account, and concluding that it is merely one factor among many, with its weight varying with different factual contexts).

---

[16] This is called a "fully insured" plan, where the insurer both pays benefits and determines eligibility. This type of structure is contrasted with a "self-insured" plan where the employer pays the benefits itself, and contracts out the eligibility determinations to third party contractors.

Defendants argue that there is no conflict of interest in this case because the Plan Sponsor (Ascension) has delegated the claims administration authority to Sedgwick. Defendants have set up a self-insured plan, as opposed to the fully insured plan in <u>Glenn</u>. Therefore, the payor of benefits is not the same entity that decides who is entitled to benefits. According to Defendants, this entitles them to an abuse of discretion standard and a determination that no conflict of interest exists.

As an initial matter, the Court finds that Plaintiff has waived this issue by not addressing it earlier when the Court gave Plaintiff an opportunity to do so. As noted above, the Court gave Plaintiff an opportunity to file a motion for expanded discovery concerning possible conflicts of interest. This matter was addressed at the Rule 16 Conference held at the outset of the case, and the Case Management Order specifically allowed Plaintiff to attempt to pursue this issue. (<u>See</u> ECF No. 16 at 1) Plaintiff did not file such a motion, so the Court considers this issue waived. <u>Cf</u>. <u>Ross v. Garner</u> 285 F.3d 1106, 1114 (8th Cir. 2002) (holding that a party may not "advance theories" at trial in contravention of a pretrial order).

Even if Plaintiff had not waived this issue, however, the Court would find Kraus' arguments unavailing. The Court agrees with Defendants that there is no conflict of interest here, and that therefore, an abuse of discretion standard applies. The undisputed facts show that Ascension Health has expressly delegated the authority to determine claims to Sedgwick. Section 2.3 of Article II of the Ascension Health Long-Term Disability Plan states that: "[Sedgwick] shall have the discretionary authority to decide all questions arising in connection with the administration, interpretation and application of the Plan." (AR 16) Ascension (the Plan sponsor) contracts with Sedgwick to administer the benefits plan and make benefits determinations. Meanwhile, disability benefits are paid from the Ascension Health Welfare

Benefits Trust (AR 14-15, 18)  Therefore, this is not a case—as in <u>Glenn</u>—where an entity has an interest in denying claims simply because every claim denied is extra money in that entity's pocket.  <u>Glenn</u> involved a fully-insured LTD Plan which both paid for and determined eligibility for benefits; at issue here is a self-insured plan where one entity determines eligibility and another, separate entity pays the bills.

Moreover, even if there were a structural conflict of interest, that fact is not, in and of itself, sufficient to alter the standard of review.  <u>See</u> <u>Whitley</u>, 815 F.3d at 1140 (holding that "altering the standard of review solely for this reason would be contrary to the case-specific test adopted in <u>Glenn</u>.").  Under binding Eighth Circuit law, Kraus must do more than simply allege that Defendants have an incentive to not approve her disability claim.  In order for a more stringent standard of review to apply, Kraus must allege additional facts, such as for example, a history of biased claims adjudications, or other, more direct evidence tending to show a conflict of interest that affected benefits decisions.

Finally, although it is not binding on the undersigned, a court in this District has already evaluated the Ascension plan at issue in this case.  That court determined that there is no conflict of interest and, therefore, the district court must review the ERISA decision deferentially.  <u>See</u>, <u>Vega v. Ascension Health and Sedgwick</u>, 997 F. Supp.2d 1000, 1009 (E.D.Mo. 2014) (applying the abuse of discretion standard of review to the same LTD Plan at issue in this case, and based on the same grant of discretionary authority cited above).

### 2.  <u>Substantive Abuse of Discretion Review</u>

Having determined the relevant standard of review, the Court will consider the merits of Kraus' contention that the decision to deny her benefits is an abuse of discretion.  Kraus makes

several arguments that the decision to discontinue her disability benefits was arbitrary and capricious, and an abuse of discretion. The Court will address each of her arguments in turn.

### i.     Initial Denial Letter

Kraus' first argument is that the decision to terminate her benefits was arbitrary and capricious because the initial denial letter failed to give adequate notice of the reasons for the termination, and because Defendants purportedly changed their reasons for denying the benefits. (ECF No. 50 at 4) Defendants respond by arguing that the termination letter gave Kraus adequate notice as to the fact of her termination from benefits and the reasons behind that determination. Defendants point out that the letter also disclosed the records that Defendants relied upon, and laid out Kraus' options for appealing administratively. Defendants conclude that this notification complied in all respects with ERISA.

Also, Defendants contend that their reasons for discontinuing Kraus have never changed—they simply took into account new medical evidence submitted during Kraus' appeal that demonstrated an independent reason for discontinuing benefits.

ERISA requires Plan Administrators to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." See 29 U.S.C. § 1133(1). "The purpose of this requirement is to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." DuMond v. Centex Corp., 172 F.3d 618, 622 (8th Cir. 1999).

The record in this case establishes that on July 29, 2013, Sedgwick sent Kraus a letter, informing her that she no longer qualified for disability benefits under the plan "because [she] no longer satisf[ied] the definition of disability beyond 7/31/2013." (AR 448) That letter also

provided the definition of disability under the Plan (discussed on p. 7-8, above), including the fact that the definition changes after two years. The letter discussed how Kraus had to be disabled from performing the "material duties" of her prior occupation for the first two years of benefits, and that after two years, she had to be disabled from doing "any occupation."

The letter also identified the portions of the administrative record that were used in making the decision that Kraus did not meet the "any occupation" definition of disability—a medical review by Nurse Margie Vargo, the FCE (which indicated that Kraus could engage in Sedentary work), the TSA (which provided examples of jobs that Kraus can do in the regular economy), and Kraus' award of Social Security benefits. (AR 449-50) The letter concluded by reasoning that this information, taken together, did not establish her continuing disability. (Id.) The letter also explained the appeal process that Kraus could pursue if she disagreed with Sedgwick's decision. (AR 450)

Kraus argues that this notice does not meet the requirements of § 1133(1). In support, Kraus points to case law suggesting that form letters that conclusorily state claimants do not meet plan requirements will not suffice to meet the "specific reasons" requirement. See Richardson v. Central States, Southeast & Southwest Areas Pension Fund, 645 F.2d 660, 665 (8th Cir. 1981) ("Bald-faced conclusions do not satisfy this [notice] requirement."); see also Brumm v. Bert Bell NFL Retirement Plan, 995 F.2d 1433, 1436-37 (8th Cir. 1993) (holding that a letter which simply and conclusorily stated that the employee "did not meet the requirements" of disability was inadequate notice).

Defendants respond by arguing that Plaintiff's cases are distinguishable because the notice given in those cases was much more conclusory than the notice given in Kraus' case. Defendants also point to language in recent case law stating that a claim denial "need not be

extensive."  See Chorosevic v. Metlife Choices, 600 F.3d 934, 943-44 (8th Cir. 2010) (holding

that nothing in ERISA or the accompanying regulations requires denial letters to identify all of

the materials and information on which a denial is based).

This Court agrees with Defendants.  The cases Plaintiff cites are inapposite because they

are much more conclusory and barebones than the notice that Kraus received.  Kraus' letter did

not simply say that she was not disabled under the Plan, as in Brumm.  Kraus' letter explained

the definition of disability in the Plan, along with other relevant and binding definitions; it

identified the name and qualifications of the medical staff who evaluated Kraus' file; it indicated

the evidence that the determination was based upon (the FCE[17], the TSA, and the Social Security

decision); it identified specific exertional limitations Kraus was capable of, and how she did not

meet the definition of disabled; and it identified the process and documentation by which the

Plan identified other jobs that Kraus could perform.  The letter also specifically addressed the

fact that there was contrary evidence in the form of Kraus' Social Security adjudication, but that

that piece of evidence did not change the ultimate conclusion of the Plan administrator.  Finally,

the letter properly informed Kraus about how to appeal the administrator's decision, and

discussed the types of evidence that would be needed to appeal the decision.  (AR 448-50)  The

letter is sufficient to meet the notice requirements established by § 1133, the implementing

---

[17] Plaintiff also alleges that it is unclear whether the denial was based upon the 2011 FCE or the 2013 FCE.  This argument is unavailing for several reasons.  First, the TSA referenced in the denial letter specifically cites to the 2013 FCE.  Second, it accords with common sense that the 2013 denial letter would reference the 2013 FCE—not the 2011 document from two years earlier that the 2013 document was meant to replace.  In any event, the purpose of a denial letter is to provide "notice" of the basis of the denial, and as Plaintiff points out, the two FCE's are almost identical.  Therefore, Plaintiff was bound to get notice of the substance of the reason for her denial from either document.

regulations, and Eighth Circuit case law.  See Chorosevic, 600 F.3d at 943-44.[18]  It certainly

gave Kraus "enough information to prepare adequately for further administrative review or an

appeal to the federal courts."  DuMond, 172 F.3d at 622.

Finally, although the Court finds that the initial notice in this case comported with the

requirements of ERISA, the Court notes that even if the initial notice was deficient, that fact—by

itself—would not be sufficient to require remand because Kraus was not hampered from

appealing internally, and because this Court merely reviews the *final* decision of the

administrator.  See Whitley, 815 F.3d at 1140-41 (holding that a "reviewing court reviews the

claim administrator's *final* decision to deny a claim, rather than the initial denial that was

reconsidered during the internal appeal") (emphasis added).

Next, Kraus argues that Defendants impermissibly changed the reason underlying the

termination of her benefits.  (ECF No. 50 at 6)  Kraus notes that the initial denial letter stated that

her benefits were being terminated because she was no longer disabled after July 31, 2013; she

then alleges that at the time of her final denial in April of 2014, Defendants noted that Kraus was

---

[18] Additionally, it is clear that the evidence recited here follows the requirements of the regulations implementing the notice requirement of § 1133.  Those regulations are found at 29 C.F.R. § 2560.503-1(g).  They require that a notification of an adverse benefit determination set forth (in relevant part)—
 (i) The specific reason or reasons for the adverse determination;
 (ii) Reference to the specific plan provisions on which the determination is based;
 (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation for why such material or information is necessary;
 (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of [ERISA] following an adverse benefit determination on review;
 (v) In the case of an adverse benefit determination by a plan providing disability benefits, if an internal rule, guideline, protocol, or other criteria was relied upon in making the adverse determination, the notification must either include that specific rule, or a statement that a copy of the rule will be provided free of charge upon request.

not entitled to benefits because she was not *continuously* disabled after July 31, 2013. Kraus maintains that this change of reasons is arbitrary and capricious.

As discussed above, the facts show that the original denial letter on July 29, 2013 said that Kraus was not disabled as of August 1, 2013, because she could engage in Sedentary work at that time. (AR 449) The facts also show that on April 22, 2014, Defendants sent Kraus a letter containing their final determination in this matter. That letter discussed the appeal process that Kraus went through, described the process that Sedgwick went through in adjudicating her appeal; the nature of the evidence considered on appeal; the individuals responsible for making the decision; and the final decision. (AR 1013-15) The April 22, 2014, letter said that Kraus was not disabled as of August 1, 2013, and that even if she was disabled due to her back surgery in December of 2013, she was not *continuously* disabled after August 1, 2013. (AR 1014-15)

Kraus' argument that the reasons for the termination changed cannot be sustained on this record. Defendants' contention has always been that Kraus' benefits had to be terminated because she was capable of working after July 31, 2013. That was Defendant's position in the initial notice, and it was Defendants' position in April of 2014. (See AR 1014) ("You are not disabled from the ability to perform any occupation [as of August 1, 2013].") Defendants only mention the continuity issue because on appeal, Kraus submitted additional medical information that she required back surgery in December of 2013 that may have left her temporarily disabled. At that point, there was an *additional* reason for Defendants to deny benefits—that Kraus was not continuously disabled. That conclusion does not alter the fact that Kraus' benefits were initially terminated because she was capable of work after July 31, 2013.

Next, Kraus argues that Defendants' decision to terminate benefits on July 31, 2013, was unsupported by substantial evidence where they initially approved Kraus for benefits under the "any occupation" standard in September of 2012, and then—using the same evidence and without any medical improvement—terminated Kraus' benefits under the "any occupation" standard at the end of July 31, 2013. (ECF No. 50 at 7-8; ECF No. 63 at 6-8)

In support of this contention, Kraus points to case law from this Circuit holding that using the same information to approve LTD benefits and then terminate benefits is an abuse of discretion, as is a decision to approve then deny disability benefits without a material change in medical status. See Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan, 874 F.2d 496, 500 (8th Cir. 1989) (holding that no deference is due to a Plan's decision to use the same evidence which once supported a finding of disability to now support a finding of no disability); McOskar v. Paul Revere Life Ins. Co., 279 F.3d 586, 589 (8th Cir. 2002) (noting that benefits cannot be terminated without a significant change in status). Defendants respond by arguing that there was new medical information after the 2012 decision to continue Kraus' benefits, and deny that they simply changed the outcome based on the same evidence.

It is true that, on September 6, 2012, Defendants appear to have approved—or at least continued—Kraus on disability under the any occupation definition. (AR 347) And yet on July 29, 2013, they found her not disabled under that same definition. (AR 449) Nevertheless, Kraus' argument is unavailing. Primarily, this is because the 2013 decision to terminate benefits could not have been based on the same evidence as the 2012 decision to permit disability benefits because the 2013 decision to deny benefits was substantially based upon the 2013 FCE, and the 2013 TSA. Those documents—from 2013—were not in existence at the time of the

2012 decision to continue benefits. It is simply not true that the 2012 decision which continued benefits, and the 2013 decision which terminated benefits, were based upon the same pieces of information.

Therefore, the cases Kraus cites do not advance her cause because in each of those cases, the defendant relied on the exact same report to both approve and deny benefits. See Gunderson, 874 F.2d at 500 (holding that no deference is due a Plan's decision to terminate benefits where the Plan had previously used the exact same evidence to find that the plaintiff was totally disabled); see also Buss v. United of Omaha Life Ins. Co., 2014 WL 4377693 at *18 (D. Kan. 2014) (holding that a determination that a person is disabled one day, and not disabled the next day, "upon review of the same information fits the very definition of arbitrary"). The September, 2012 approval and July, 2013 denial were not based on the same medical documentation.

Kraus' second point is that Defendants did not demonstrate any medical improvement between the 2012 decision approving benefits under the any occupation standard and the 2013 decision terminating benefits under the any occupation standard. As an initial matter, the Court does not understand Defendants to be arguing that there was medical improvement between September 2012 and August of 2013. Rather, Defendants did not have sufficient medical evidence in September of 2012 to make a definitive decision as to whether Kraus continued to be entitled to benefits under the any occupation standard. Therefore, Defendants continued Kraus on her benefits for the time being, until they could accumulate enough evidence to make an informed decision.

It appears that Defendants did not conclusively find Kraus to be disabled under the "any occupation" standard in September of 2012. Instead, Defendants continued to pay disability

benefits until they had finished gathering sufficient and updated medical evidence in the form of the 2013 FCE and TSA.

At oral argument, the Court inquired as to why it took ten months to evaluate Plaintiff under the "any occupation" standard. Defendants represented that they continued to pay benefits as a "placeholder," until there could be a further evaluation. The Court finds this representation persuasive, especially because the medical evidence—including the 2011 FCE—was two years old at that point. It would be entirely reasonable to seek updated, reliable evidence, including the 2013 FCE, before deciding whether Plaintiff's LTD benefits should be discontinued.

As a practical matter, a contrary decision from the Court would put an administrator in the tough spot of having to decide immediately whether to terminate a claimant's benefits the minute that the eligibility criteria change—for fear of having that action held against them as Plaintiff seeks here—or continuing claimants on their benefits for a reasonable period of time while the administrator conducts a thorough investigation and analysis.

### iii. Reviewing Physician vs. Plaintiff's Treating Physician

Kraus' third argument is that Defendants' decision is not supported by substantial evidence because Defendants relied on an "incomplete" review of the record by "its hired physician," while "ignor[ing] the opinions of Plaintiff's treating physicians." (ECF No. 50 at 8) Kraus complains that during her appeal of the initial termination decision, Defendants ignored her treating physician and instead conducted a biased and incomplete review of only the dry medical record.

As an initial matter, Dr. Parisien does not in fact work for Defendants. Dr. Parisien works for Reliable Review Services, an independent third party contractor; and Kraus puts forth

no evidence to suggest that Dr. Parisien has any improper connection with Defendants or that his compensation was in any way affected by the nature of his medical opinion.[19]

Apart from allegations that Dr. Parisien is an improper or partial medical source, Kraus implies that his review is not entitled to as much weight as the opinions of her treating physicians because it was a review of the paper record, and Dr. Parisien did not personally examine her. This is not a proper basis upon which to discount Dr. Parisien's opinion. Unlike traditional social security adjudications or similar scenarios, a treating physician is not entitled to special deference under ERISA. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."); see also Whitley, 815 F.3d at 1142 (holding that a plan administrator "was not required to give special deference to the opinions of [claimant's] treating physicians") (citing Nord, 538 U.S. at 825). Therefore, Defendants were entitled to rely on Dr. Parisien, even where his opinion conflicted with the opinion of Kraus' treating physician.

Furthermore, Dr. Parisien did in fact consider the opinions of Kraus' treating physicians, as well as her subjective complaints. For example, Dr. Parisien examined and discussed Ms. Keyes' findings, as well as Dr. Dietz' documentation; and Dr. Parisien spoke with Dr. Sidhu. (AR 996-1001) The list of treating sources that Dr. Parisien consulted during his review was very thorough. (Id.) Dr. Parisien took the opinions of these medical providers into account, and came up with his own conclusions, even though he sometimes disagreed with Kraus' treating

---

[19] Additionally, the Court gave Kraus the opportunity to file a motion to justify expanded discovery on Defendants' conflicts of interest, and Plaintiffs failed to do so. Therefore, issues that may (or may not have) been available only upon such discovery are now waived.

medical providers. Given this contradiction in the evidence, Defendants were entitled to credit Dr. Parisien's conclusions. See Johnson v. Metro Life Ins. Co., 437 F.3d 809, 814 (8th Cir. 2008) ("When there is a conflict of opinion between a claimant's treating physicians and the plan administrator's reviewing physicians, the plan administrator has discretion to deny benefits unless the record does not support denial."); see also Groves v. Metro Life Ins. Co., 438 F.3d 872, 875 (8th Cir. 2006) (stating that plan administrator was not required to accept treating physician's assessment over that of a reviewing physician); and Delta Family-Care Disability and Survivorship Plan v. Marshall, 258 F.3d 834, 843 (8th Cir. 2001) ("Where the record reflects conflicting medical opinions, the plan administrator does not abuse its discretion in finding the employee not to be disabled."). Dr. Parisien's review of the record was full and fair, and Defendants were entitled to rely upon it, even where it was contrary to Plaintiff's treating physicians.

Finally, Kraus takes issue with Defendants' statements that Dr. Parisien concluded that there were "no objective findings" to support "a complete inability to work." (ECF No. 63 at 8; AR 1001) Kraus implies that—even if those statements were correct—Defendants are using the wrong standard to discuss disability. Kraus reminds the Court that the standard for disability is whether Kraus is unable to perform any work *for which she is reasonably qualified*. The Court agrees with Kraus that this is the correct standard; but the Court does not think that Defendants have used an incorrect standard for determining disability—they were using imprecise language. It is clear that Defendants knew Kraus had to be able to do jobs *for which she is reasonably qualified* because Defendants solicited a TSA, which looked for jobs which Kraus could do given both her physical limitations and her qualifications.

### iv. **Defendants' Consideration of All of Plaintiff's Conditions**

Next, Plaintiff argues that Defendants' termination of her benefits was unsupported by substantial evidence because Defendants did not consider the cumulative impact of all of Plaintiff's conditions. Instead, Kraus argues that Defendants considered each of her conditions in isolation only. Kraus also claims that Defendants "ignored all of Plaintiff's medical conditions except the injury to [her] dominant right wrist." Kraus argues that this deprives Defendants' determination of substantial evidence and requires reversal. (ECF No. 50 at 9-10) Defendants, on the other hand, respond by arguing that they (and Dr. Parisien) considered all of Plaintiff's medical allegations in coming to the final decision to deny benefits. (ECF No. 56 at 11-12)

The Court agrees with Defendants. The Court must first note that Kraus originally sought disability on the theory that her wrist injury prevented her from doing her normal occupation. It was Kraus' wrist that prevented her from holding the probe during ultrasound tests, which was the basis of her theory that she was unable to do her job. Likewise, it was Kraus' wrist which underwent multiple surgeries. In addition, the medical evidence from Kraus' doctors that was submitted in support of her disability claim concentrated on Kraus' wrist issues. It is not surprising, therefore, that Defendants gave significant attention and focus to the extent of Kraus' wrist injury.

Furthermore, it is simply not true that "[n]either Genex, when completing the TSA, nor Dr. Parisien, nor Defendants," considered Kraus' other medical impairments. (ECF No. 50 at 10) Taking Dr. Parisien first, his evaluation specifically referenced Kraus' other medical impairments, such as a history of headaches, neck pain, and knee issues, in addition to her wrist pain. (AR 996) Dr. Parisien also addressed Kraus' complaints of "abdominal pain and back

pain" and anterior cruciate ligament ("ACL") issues. (AR 998) Dr. Parisien specifically discussed Kraus' back issues and back surgery with Dr. Sidhu. (AR 1002) Furthermore, the list of documents that Dr. Parisien reviewed demonstrates the wide range of medical evidence and sources that he synthesized prior to his ultimate opinion—these documents covered a wide range of Kraus' medical impairments. (AR 1002-05)

As for Defendants, the record also refutes that they did not consider a wide range of medical evidence. For example, the final decision denying LTD benefits, dated April 22, 2014, lists multiple records used in making the determination. Defendants considered medical records from St. John Physical rehabilitation, Dr. Dietz, Dr. Scott, Dr. Randazzo, Kathleen Davis, Mary Keyes (the physical therapist), Dr. Sidhu, Dr. Halprin, and Dr. Macek. (AR 1013) These records span the timeframe of June 2005 to October 2013. Defendants considered a wide range of medical evidence dealing with Kraus' medical conditions holistically.

Furthermore, the April 2014 final notice details the conclusions of Dr. Parisien, and explains the conclusions that Defendants reached concerning Kraus' medical impairments and physical limitations. (AR 1013-15) That notice explains the exertional limitations Kraus is capable of achieving, and the jobs she can do within those physical limitations, considering her education, training, and background. (AR 1014) Defendants engaged in a holistic, wide-ranging review of Kraus' entire file.

Kraus cites Torres v. Unum Life Ins. Co. of America, 405 F.3d 670 (8th Cir. 2005) for the proposition that insurers are required to consider the effect of all impairments, including side effects from medication. (ECF No. 50 at 10) Kraus alleges that Defendants ignored several other physical impairments that Kraus suffers from, including severe headaches, cervical

radiculopathy, and her lumbar discectomy, among other impairments.  (ECF No. 50 at 9-11)
Kraus argues that this failure requires reversal.  (Id.)

Torres, however, is not controlling in this situation.  In Torres, an employee suffered
from substantial hearing loss and heart disease, but the disability insurer found that he was not
disabled from performing his job as a perfusionist—a surgical room technologist who operates
the heart-lung machine during cardiopulmonary bypass.  Torres, 405 F.3d at 671.  In making its
determination, the insurer made several glaring procedural and analytical errors.  Among other
problems, the insurer violated the terms of its own policy by failing to consider un-contradicted
medical evidence that the claimant's heart medication caused confusion and light-headedness
which would preclude performance of claimant's job; the insurer failed to conduct a vocational
evaluation to determine whether—given the claimant's medical limitations—he was capable of
performing his job.  In addition, the insurer failed to have an independent physician review the
medical records, and based its decision, in part, upon "innuendo, misstatements, and unsupported
conclusions."  Id. at 676.

In contrast to Torres, in this case, the record shows that Defendants did not simply
address isolated medical issues in a vacuum.  Instead, for all the reasons discussed above, the
Court finds that Defendants considered all of Kraus' medical limitations, and based their
decision upon a holistic assessment of Kraus' ability.  Defendants did not abuse their discretion.

### v.    Defendants' Consideration of Kraus' Pain

Next, Kraus argues that Defendants "failed to consider the disabling effects of [her]
pain."  (ECF No. 50 at 10-12)  In particular, Kraus claims that both FCEs concluded that
Plaintiff's complaints of pain "are consistent with" her objective diagnoses, but Defendants
"disregarded" that pain.  (Id. at 11)  Plaintiff accuses Dr. Parisien of ignoring the pain, and the

2014 TSA of failing to include pain in its analysis of jobs that Kraus could do. Kraus cites Willcox v. Liberty Life Assur. Co. of Boston, 552 F.3d 693, 701-02 (8th Cir. 2009) for the proposition that an insurer may not ignore the existence of pain and the effect that it has on a claimant's ability to work.

Defendants respond by arguing that the 2013 FCE took Kraus' pain into account in its findings when it examined "her overall functionality." (ECF No. 56 at 13) Defendants also point out that Dr. Parisien mentioned Kraus' reports of pain in his report, and dispute the fact that he ignored pain simply because he did not explicitly reference pain in his analysis.

The Court agrees with Plaintiff that Defendants did not explicitly and thoroughly analyze the issue of pain in great detail, but holds that this failure—in and of itself—is not sufficient to find that the administrator's decision was unsupported by substantial evidence. The Court cannot look at one fault within a decision in isolation. Rather, the Court must determine whether the record as a whole demonstrates that the administrator's decision is arbitrary and capricious.

The Court agrees with Defendants that Dr. Parisien adequately considered pain when evaluating Kraus' overall functionality. Dr. Parisien, in reviewing Kraus' medical records, had access to all of the objective evidence documenting Kraus' problems with pain. He had access to the 2013 FCE, which states that Kraus' "[p]ain complaints and subjective signs of discomfort are consistent with the diagnosis." (AR 423, 477) The fact that Dr. Parisien had access to and reviewed all of this material means that it was considered, even if it was not explicitly and precisely addressed. Cf. Rutledge v. Liberty Life Assur. Co. of Boston, 481 F.3d 655, 660 (8th Cir. 2007) (holding that where relevant evidence "was in the claim file, and [the administrator's] decision was made based upon consideration of the entire file," the administrator "was not required to specifically mention each document it considered in reaching its decision").

With regard to Kraus' case law, <u>Willcox</u> is not controlling here. In <u>Willcox</u>, a plan administrator's decision denying LTD benefits was unsupported by substantial evidence where the claimant's main claim was radiculopathy (leg pain) caused by ongoing irritation of the nerve root emanating from a segment of her spine, but the reviewing doctor *mischaracterized* medical evidence in several important ways. For instance, the doctor twice claimed, inaccurately, that the medical file showed "no objective evidence" of radiculopathy, and inaccurately stated that diagnostic testing showed that nerve block procedure offered no relief; and a second doctor's report was based on incomplete, selective review of the medical record and ignored evidence tending to support the employee's claim. <u>Wilcox</u>, 552 F.3d at 700-01. In essence, the reviewing doctors made several medical determinations that were flatly contradicted by the underlying medical evidence, and the decision to deny benefits was based on that opinion. Additionally, the doctor in <u>Willcox</u> discussed the *cause* of the claimant's pain in that case, but did not rebut that the claimant was *in fact* experiencing debilitating pain. <u>Id</u>. at 701.

<u>Willcox</u> is factually distinguishable in material ways. Here, we do not have a situation where the doctors or the administrator made blatantly incorrect representations of the medical evidence. In fact, the medical evidence accepted that Kraus suffered from some level of pain, yet Defendants decided that the showing was not sufficient to demonstrate Kraus was unable to perform any occupation. Although Defendants could have more explicitly analyzed how Kraus' pain played into their analysis, the Court cannot say—especially given the deferential standard required here—that this shortcoming deprives the administrator's decision of substantial evidence supporting the decision.

### vi. Defendants' Consideration of Kraus' Social Security Award

Next, Kraus argues that Defendants "failed to consider" the fact that the Social Security Administration found Kraus to be disabled.  (ECF No. 50 at 12)  Kraus argues that this failure suggests procedural unreasonableness, and points to case law that requires an insurer to explain differences between Social Security Administration findings and findings of disability plans. See Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 635 (9th Cir. 2009) (noting that an insurer's failure to explain why it reached a different conclusion than the SSA is one factor in determining whether the insurer abused its discretion); see also Glenn, 554 U.S. at 118 (holding that failure to even consider a Social Security disability award suggests procedural unreasonableness); and Petrone v. Long Term Disability Income Plan, 935 F. Supp.2d 278, 295 (D. Mass 2013) (holding that the reasoning of the SSA cannot simply be ignored).

This argument does not hold up in view of the administrative record.  First, Defendants expressly considered the fact that the Social Security Administration awarded disability benefits to Kraus.  (See AR 449) ("Although we are aware that you have been previously awarded Social Security Disability benefits, current medical and vocational assessments do not indicate that you continue to be disabled from all work activity.")  Therefore, Kraus' citations are inapposite, because Defendants clearly at least considered the Social Security issue, as opposed to the defendants in cases like Montour or Glenn, who ignored contrary SSA conclusions.  See Glenn, 554 U.S. at 118 (discussing how MetLife "ignored" the contrary decision of the SSA), and Montour, 588 F.3d at 635 (noting that the defendant in that case "made no mention of the SSA's contrary determination in its initial termination decision").

Second, to the extent that Kraus suggests there is an additional duty to engage with a Social Security Administrative Law Judge's analysis in more detail, that may be the law of other

circuits, but it is not a rule in the Eighth Circuit.  Compare Montour, 588 F.3d at 635 (noting that

"there is a distinction between *mentioning* a contrary determination and *discussing* it") (emphasis

in original and citation omitted) with Rutledge, 481 F.3d at 660 (holding that where a social

security decision "was in the claim file, and [the administrator's] decision was made based upon

consideration of the entire file," the administrator "was not required to specifically mention each

document it considered in reaching its decision").  Indeed, in Rutledge, the administrator did not

even mention the social security decision.  To the extent that Kraus wants a more reasoned

distinction between the ALJ's disability decision and that of the Defendants, she is not entitled to

reversal on that ground.[20]

Third, on the broader question of the weight due to a social security decision, it remains

the case that an administrator of a benefits plan is not bound by the determinations of the Social

Security Administration, and extensive Eighth Circuit case law has approved denials of benefits

which were at odds with the Social Security Administration.  See Farfalla v. Mutual of Omaha

Ins. Co., 324 F.3d 971, 975 (8th Cir. 2003) ("[A]n ERISA plan administrator or fiduciary

generally is not bound by an SSA determination that a plan participant is disabled, even when the

plan's definition of disabled is similar to the definition the SSA applied.") (internal quotations

and alterations omitted); see also Rutledge, 481 F.3d at 660 (approving a plan administrator's

decision denying benefits even where the SSA determined claimant was disabled).  In sum, the

---

[20]     Kraus relies primarily on Ninth Circuit cases for the proposition that a plan administrator
must address the Social Security Administrations rulings in some depth.  See Montour, 588 F.3d
at 635; see also Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 676 (9th Cir. 2011)
(holding that failure to address a Social Security award offers support for the conclusion that the
plan administrator's denial was arbitrary and an abuse of discretion).  As discussed above, no
Eighth Circuit cases appear to come to this conclusion.

mere fact that Kraus was awarded benefits by the Social Security Administration does not bind

Defendants to a similar outcome, or to an in-depth explanation of its contrary reasoning.[21]

### vii.    Defendants' Weighing of the Evidence

Finally, Kraus argues that Defendants' termination of her disability benefits was

unsupported by substantial evidence because they "failed to make reference" to several pieces of

medical evidence which Kraus says provide substantial evidence that she remains disabled under

the any occupation standard.  (ECF No. 50 at 12-14)  Kraus' implication is that Defendants

combed the record for evidence in their favor while ignoring other evidence demonstrating

disability.

The Court finds this argument to be unpersuasive for multiple reasons.  First, many of the

pieces of evidence that Kraus cites are not relevant—most of this evidence consists of medical

records indicating that Kraus could not do the material duties of her old job as an ultrasound

technician, not that she was disabled under the any occupation standard.  (See e.g. ECF No. 50 at

13-14)  For example, Kraus claims that on May 9, 2013, Dr. Barker "opined that Plaintiff

remained totally disabled from her occupation and that she was unable to use her right upper

---

[21] Defendants make an alternative argument that the Social Security decision "actually
supports [Defendants'] denial."  (ECF No. 56 at 14-15)  Defendants argue that the ALJ's
decision "actually concluded that Plaintiff had 'the residual functional capacity to perform
sedentary work,'" and that the only reason the ALJ then found that Kraus was disabled was
because he credited her hearing testimony concerning additional exertional limitations that were
not supported by the objective medical evidence.  Once those additional exertional limitations
were taken into consideration, the job market was sufficiently eroded that Social Security
regulations directed a finding of disabled.

Defendants' argument is that in the ERISA context, they are not required to credit Kraus'
unverified and subjective claims of additional exertional limitations beyond what the objective
medical evidence shows.  See Manning v. Am. Republic Ins. Co., 604 F.3d 1030, 1041-42 (8th
Cir. 2010).  The Court need not go so far as to say that the ALJ decision actually *supported a
denial of disability* benefits.  It is sufficient to say that Defendants in this matter were not bound
by that decision, and that Defendants have offered a reasonable explanation as to why they could
reasonably come to a different conclusion from that of the Social Security Administration.

extremity." (Id. at 13)  Also, Kraus argues that the 2013 FCE supports her argument because it found "Plaintiff is unable to perform any of [her] normal job duties as an Ultrasound Technician." (Id.)

But whether Kraus can perform the material duties of her own job is not the relevant question.  The question, under the terms of the disability plan, is whether she can do "any occupation," given her training, education, and background.  And there is ample evidence in the record that Kraus can perform Sedentary or Light work, including evidence from Kraus' own providers.  Ms. Keyes, Dr. Dietz, and Dr. Parisien all agreed that Kraus is capable of at least Sedentary work.  In both the 2011 and the 2013 FCEs, it was determined that Kraus can engage in at least Sedentary or Light work.  (AR 219, 424)  As early as January 12, 2012, Dr. Dietz released Kraus to return to work at a Light level of work, with some restrictions.  (AR 249)  Additionally, even Dr. Sidhu, who performed Kraus' back surgery in December of 2013 opined that Plaintiff could work as of August 1, 2013.  (AR 1000)

Second, even though the denial letter sent by Sedgwick did not address all of the individual pieces of medical evidence that Kraus cites in her brief, it is clear that the 2013 FCE, as well as Dr. Parisien's independent opinion reviewed, considered, and incorporated the entire medical record.  (See, e.g., AR 1002-05) (listing the pieces of medical evidence that Dr. Parisien used in his independent review)  It is clear, therefore, that the medical evidence relevant to Kraus' alleged disability was considered.

Third, an administrator is "not required to specifically mention each document it considered in reaching its decision."  See Rutledge, 481 F.3d at 660.  ERISA case law does not require Defendants to address every piece of contrary evidence.  Instead, administrators are required to consider only a claimant's reliable and contrary evidence.  Nord, 538 U.S. at 834.

Finally, it is undisputed that no doctor—apart from Dr. Barker—ever opined that Plaintiff was totally disabled, within the meaning of the LTD plan, as of August 1, 2013, when benefits were denied. Dr. Dietz did not opine that she was disabled. Dr. Sidhu acknowledged that she was *not* disabled. And Dr. Parisien found that she was not disabled. Even Dr. Barker's conclusions were not based upon any objective evidence. In fact, Dr. Barker explicitly deferred to Dr. Dietz's conclusions regarding Kraus' disability—and Dr. Dietz had previously found Kraus capable of performing Light Work. Moreover, Dr. Barker only opined that Kraus was disabled from performing her own occupation—not any occupation, which was the relevant standard at the time of Defendants' decision.

## III.    Conclusion

In conclusion, the Court finds that, on this record, substantial evidence supports Defendants decision to discontinue benefits. Defendants provided Kraus the "full and fair review" ERISA requires before denying her appeal from the initial decision to discontinue LTD benefits. See Whitley, 815 F.3d at 1141. Defendants' expert doctors found that Kraus could return to a sedentary job, with restrictions; most of Kraus' own doctors, including Dr. Sidhu, concluded that she could work, with restrictions. Based upon these doctors' opinions, taking into account Kraus' physical limitations, education, training, and past-earnings, Defendants found jobs that Kraus could perform.

This is a case where—given the quality and quantity of evidence that Defendants have—Kraus cannot overcome the substantial evidence standard. "Only when the evidence relied on is 'overwhelmed by contrary evidence' may the court find an abuse of discretion." Whitley, 815 F.3d at 1142 (quoting Coker v. Metro Life Ins. Co., 281 F.3d 793, 799 (8th Cir. 2002)). This Court's duty is to examine the record and "determine whether a reasonable person *could* have—

not *would* have—reached a similar decision." <u>Wakkinen v. UNUM Life Ins. Co. of America</u>, 531 F.3d 575, 583 (8th Cir. 2008) (emphasis added). A reasonable person *could have* decided that Kraus is not disabled under the terms of the ERISA plan at issue here. That is all that is required under ERISA.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 46 is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No. 49) is **DENIED**.

A separate judgment is entered this same date.

/s/ ***John M. Bodenhausen***
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of July, 2016